UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:

KEITH BUB a/k/a KEITH L. BUB,

Debtor.
---------------------------------------------------------------x

Case No. 11- 78278-reg

Chapter 7

**MEMORANDUM DECISION**

Before the Court is a motion (the "Motion") by Rockstone Capital LLC ("Rockstone") seeking to disallow claim #1 (the "Claim") filed by Alisa Metal ("Alisa"), the ex-wife of Keith Bub (the "Debtor"), as a priority claim for a domestic support obligation ("DSO"). The Motion has been joined in part by the chapter 7 trustee (the "Trustee"), who seeks to have the Claim reclassified from a priority claim to an unsecured claim, and to have the Claim reduced. The Claim arose as a result of the Debtor's failure to satisfy one of the mortgage liens encumbering the marital residence, as required under the terms of the parties' prepetition divorce settlement agreement (the "Settlement Agreement"). Rockstone argues that the Court is bound by the language of the Settlement Agreement, which refers to the Debtor's obligation as part of an equitable distribution of marital property rather than as an obligation for alimony, maintenance, or support. In addition, since the Settlement Agreement entitles Alisa to satisfy the Claim by foreclosing on other property of the Debtor that has been pledged as security, Alisa is limited to the amount she collects from the foreclosure sale of that property. Alisa asserts that the Court is free to determine on its own whether the Debtor's obligation is in fact a DSO, without regard to how it is characterized in the Settlement Agreement. Alisa argues that the Claim is properly characterized as a DSO because the satisfaction of the Debtor's obligation results in providing her with shelter. The Trustee disputes the calculation of the Claim and argues that the Claim should be reclassified as a general unsecured claim to the extent any amount remains due and

owing after Alisa has collected against the security pledged to her under the terms of the Settlement Agreement.

The Court acknowledges that these are the issues it has been asked to decide, however, the parties have not properly considered how the 2005 amendments to the Bankruptcy Code[1] will impact resolution of these issues. Under BAPCPA, Congress not only provided that DSO claims have the highest priority, but also added "domestic support obligation" as a defined phrase under Bankruptcy Code section 101(14A). Due to this newly-added definition, the Court must examine the language of the definition and take a fresh look at pre-BABCPA case law regarding DSOs to determine whether these cases are still applicable to the issues before the Court. The first issue the new language raises is whether it matters that the payee is not an entity named in the definition. Pre-BAPCPA, the controlling case in this circuit was *Pauley v. Spong (In re Spong)*, 661 F.2d 6, 7 (2d Cir. 1981), in which the Second Circuit concluded that a debtor's agreement to pay his ex-spouse's attorney fees incurred during a divorce proceeding created a non-dischargeable family support obligation because the ex-spouse would remain liable for the debt if the debtor failed to pay it. *See id.* As a result of BAPCPA, a DSO now includes an obligation "recoverable by" a spouse, which modifies the specific payee requirements found in the Code pre-BABCPA. Alisa was granted the right to recover from the Debtor pursuant to the indemnification language contained in the Settlement Agreement; this satisfies the payee requirement of the statute. Therefore, to the extent that *In re Spong* created an exception to the strict payee requirement for obligations that the non-filing spouse could recover from the debtor, the exception has been codified in the Bankruptcy Code. So long as Alisa has the right to recover the Claim from the Debtor, which she does, the fact that the underlying obligation is not payable directly to her does not change the outcome.

[1] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

The Court must now determine whether the Claim fits within the remainder of the definition of a DSO under the Code. If, as Rockstone argues, the Court may only look to the language in the Settlement Agreement to determine whether the Claim should retain its priority status, then Rockstone would be correct that the Claim is not a DSO and that it should be either disallowed or reclassified as unsecured. However, Alisa asks the Court to disregard the wording of the Settlement Agreement and find that based on the facts at the time the Settlement Agreement was executed, the relative financial positions of the Debtor and Alisa, and the actual structure of the payments set forth in the Settlement Agreement, the Claim is in the nature of a DSO, entitled to priority of payment pursuant to Bankruptcy Code section 507(a)(1)(A).

Based on a plain reading of the relevant Code provisions, including the definition of a DSO, the Court finds that the Claim is a DSO, entitled to priority treatment, and denies the Motion. Bankruptcy Code section 101(14A), which defines a DSO as a debt owed to a spouse or former spouse that is in the nature of alimony, maintenance, or support, expressly directs that the "nature" of an obligation be determined "without regard" to how the obligation is characterized in the agreement giving rise to such obligation. Therefore, Rockstone's argument that the characterization of the Claim in the Settlement Agreement governs the priority of the Claim in the Debtor's bankruptcy case is incorrect. Because Alisa is unable to maintain the marital residence absent the Debtor's agreement to pay his mortgage obligation on the residence, the obligation fits squarely within the definition of a DSO. Where, as in this case, a spouse undertakes in a divorce settlement agreement to make payments towards shelter for the other spouse, which payments are necessary in order for the resident spouse to remain in the marital residence, the resulting obligation is in the nature of alimony, maintenance, or support. In the instant case, Alisa could not have afforded to remain in the marital residence unless the Debtor

undertook this obligation, and as a result the Claim is a DSO, entitled to priority treatment under section 507(a)(1)(A).

While the Court must make its own determination of whether the Claim is a DSO in the context of a bankruptcy, this finding does not undercut or diminish the effect of the Settlement Agreement in any other manner; the Settlement Agreement remains in full force and effect. The Court is not making any determination outside of bankruptcy regarding the nature of the Claim. In addition, the Court is not making a determination as to the amount of the Claim at this time.

## *Jurisdiction*

This Court has jurisdiction over this core proceeding under 28 U.S.C. sections 157(b)(2)(J) and 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This Memorandum Decision contains this Court's findings of fact and conclusions of law to the extent required by Bankruptcy Rule 7052.

## *Procedural History*

On November 22, 2011, the Debtor filed a voluntary petition for relief under chapter 7. Upon information and belief, the gross estate presently exceeds $130,000 and there will likely be a significant amount of additional funds available for distribution. On January 25, 2012, Alisa filed the Claim in the amount of $211,546.66 as a priority claim for a DSO pursuant to section 507(a)(1)(A) or (B) of the Bankruptcy Code. On June 15, 2012, Rockstone, as a party in interest, filed the Motion seeking to disallow the Claim pursuant to section 502(a) of the Bankruptcy

Code. Rockstone is the largest unsecured creditor in the Debtor's case.[2] Aside from the Claim, the other timely filed claims are de minimis. On July 9, 2012, Kirschenbaum & Kirschenbaum, PC, on behalf of the Trustee, filed an affirmation in partial support of the Motion. On July 18, 2012, Alisa filed opposition to the Motion. On July 23, 2012, Rockstone filed a reply, and the matter was marked submitted.

## ***Facts***

In 1993, Alisa purchased a home located in Hauppauge, NY (the "Marital Residence") for approximately $300,000. David Metal, Alisa's father, loaned Alisa $200,000 for the purchase, and the remaining $100,000 was contributed to equally by Alisa and the Debtor. At the time of purchase title to the Marital Residence was placed in the name of David Metal and Alisa.

The Debtor and Alisa moved into the Marital Residence in November 1993, approximately one year before their marriage in October 1994. Thereupon the deed was transferred into the names of Alisa and the Debtor. David Metal was granted a mortgage on the Marital Residence in the amount of $200,000 (the "David Metal Mortgage"). At the time of the marriage, aside from the Marital Residence, the only significant asset Alisa owned was a vehicle. In contrast, the Debtor entered the marriage owning a vehicle, real property in Florida (the "Cape Coral Property"), and stock in his companies, Total Computer Care, Ltd., K-2 Properties, Inc., and The Storage Guys, Inc. At no time did the Debtor and Alisa maintain joint bank accounts.

During the marriage, three mortgage liens were granted against the Marital Residence, each junior to the David Metal Mortgage. One was granted to collateralize a Small Business

[2] Rockstone filed a proof of claim in the amount of $774,225.35 based on a judgment against the Debtor as guarantor.

Administration ("SBA") loan. The SBA loan was taken out for the benefit of one of the Debtor's businesses, which had suffered a downturn due to the aftermath of 9/11.[3] A CitiMortgage loan (the "CitiMortgage Loan") was also taken out and used solely in connection with the Debtor's business. Finally, the Debtor and Alisa took out a Bank of America Equity Credit Line (the "Home Equity Loan") to pay off Alisa's Ford Expedition and the Debtor's Dodge Viper loan. Approximately $100,000 of the Home Equity Loan was also used to help the Debtor in his business.

While Alisa and the Debtor were married the income earned by each was approximately the same. Alisa and the Debtor shared the bills for their joint living expenses. Each month Alisa and the Debtor would alternate paying the David Metal Mortgage. Each paid for his or her own vehicle and individual bills. The Debtor and Alisa have no children together.

During the marriage the following property was acquired: Five acres in Livingston, NY; two acres with a residence thereon in Greene, NY; vacant property in Roxbury, NY; and vacant property in Windsor, NY (collectively, the "Marital Real Property").

In 2005, after eleven years of marriage, Alisa filed a petition for divorce. At that time, Alisa's gross annual income was $115,000, and she netted, after withholding taxes and insurance, $73,270, or $6,106 per month. In November 2007, Alisa and the Debtor entered into the Settlement Agreement. On January 24, 2008, Alisa and the Debtor were divorced by a Judgment of Divorce entered by the Honorable Donald R. Blydenberg. The Judgment of Divorce incorporated the terms of the Settlement Agreement.

According to affidavits submitted by Alisa and the Debtor, there were two overriding principles governing the drafting of the Settlement Agreement. The first principle was that each

[3] According to the Settlement Agreement, Alisa is a co-obligor on the note for the SBA loan. It is undisputed that the proceeds from the SBA loan were used for the benefit of the Debtor's business.

person should obtain title to the assets each brought to the marriage or purchased during the marriage for his or her personal use. The second overriding concern was that Alisa have sufficient funds to cover her living expenses so as to allow her to remain in the Marital Residence.

Notwithstanding the parties' stated intentions, the Settlement Agreement, which was incorporated into the Judgment of Divorce, provides as follows:

> [P]arties hereby waive payment of maintenance from one to the other and represent that each is capable of being self-supporting. Each releases and discharges the other, absolutely and forever, for the rest of his and her life from any and all claims and demands, past, present or future for support and maintenance. Neither party seeks maintenance from the other.

The Settlement Agreement also provides that (i) the debts and obligations under the agreement "shall survive any application by a spouse for a discharge under the applicable Bankruptcy code [sic] of any state," and (ii) should one spouse's bankruptcy cause the other to incur a liability, "then the instituting [debtor] spouse shall specifically reaffirm the debt that causes the non-instituting spouse to incur such liability."

The Marital Residence was encumbered by four mortgages: 1) David Metal Mortgage - $100,000; 2) Home Equity Loan - $219,000; 3) CitiMortgage Loan - $108,000; and 4) SBA loan - $185,000. All but the David Metal Mortgage had been principally incurred by the Debtor in connection with funding his businesses, paying for his collector vehicles, and completing home improvements.

Under the Settlement Agreement, Alisa assumed responsibility for the Home Equity Loan and the David Metal Mortgage. The Debtor assumed responsibility for and agreed to indemnify and hold Alisa harmless for the CitiMortgage Loan and the SBA loan as set forth in a section of the Settlement Agreement titled "Equitable Distribution." In addition to indemnifying Alisa

from any obligation under the SBA loan, the Debtor granted to Alisa a mortgage on the Cape Coral Property[4] as security for his obligation:

> [Alisa] shall be entitled to security for the payment by the husband [the Debtor] of the SBA loan in a timely fashion so as not adversely effect [sic] her credit and/or put in jeopardy her free and unencumbered use of or disposal of the [Marital Residence]. In addition, the lien by SBA shall be removed from the [Marital Residence] and from any liability against the wife [Alisa] no later than thirty-six (36) months from the date of this agreement.

By having the Debtor assume personal responsibility for two of the mortgage obligations, Alisa would be able to stay in the Marital Residence.

Pursuant to the Settlement Agreement, the Marital Residence was transferred to Alisa solely. She also received title to the Ford Expedition, and a mortgage on the Cape Coral Property. Under the terms of the Settlement Agreement, Alisa had the right to foreclose on the Cape Coral Property if the Debtor failed to remove the SBA lien within 36 months. The estimated value of the assets Alisa received under the Settlement Agreement was $491,000, assuming the Debtor satisfied the SBA loan and the CitiMortgage Loan.

The estimated value of the property that the Debtor received under the Settlement Agreement was $610,000, which was comprised of the Marital Real Property, three Dodge Vipers, the Cape Coral Property and the Debtor's stock in his companies, Total Computer Care, Ltd., K-2 Properties, Inc., and The Storage Guys, Inc.

Alisa's statement of net worth submitted in the matrimonial action showed she was incurring $3,297.66 in monthly expenses, including real estate taxes, but excluding mortgage payments. The monthly mortgage payments on the David Metal Mortgage and the Home Equity

[4] The Cape Coral Property, which was valued between $400,000 and $500,000 at the time of the marriage, had recently been placed in a trust by the Debtor.

Loan were $1,500 and $1,655 respectively, leaving her with discretionary monthly income of $142.66.

The Debtor satisfied the CitiMortgage Loan and obtained a release of the CitiMortgage lien. However, in 2010, the Debtor defaulted on the SBA loan. Upon the default, Alisa was faced with the prospect of losing the Marital Residence, and in order to protect her interests in the Marital Residence, Alisa commenced a foreclosure action on the Cape Coral Property. Thereafter, the Debtor filed a petition for relief under chapter 7. Alisa filed the Claim in the amount of $211,546.66, which was her calculation of the amount due on the SBA loan, inclusive of fees and incidental charges. The foreclosure action commenced by Alisa is currently pending, as is a suit commenced by Alisa against the Debtor in Suffolk County, New York in late 2010, wherein Alisa seeks to enforce the indemnification provisions of the Settlement Agreement by seeking a money judgment equal to the amount of the SBA loan. The action against the Debtor individually has been stayed as a result of the Debtor's bankruptcy filing. Alisa concedes that the Claim shall be reduced by the amount she realizes in the foreclosure action against the Cape Coral Property.

Rockstone's chief argument in support of disallowing the Claim is that it is not labeled as alimony, maintenance, or support pursuant to the terms of the Settlement Agreement. Rockstone argues that the Court is bound by the characterization of the Debtor's obligations in the Settlement Agreement as part of an equitable distribution of property and by Alisa's explicit waiver of any rights to receive support or maintenance. This Court, Rockstone argues, has no basis to "second guess" the express intent of the parties as memorialized in the Settlement Agreement. Rockstone believes that the sole remedy available to Alisa in the event the Debtor fails to obtain a release of the SBA loan is the right to foreclose on the mortgage encumbering

the Cape Coral Property. As additional support for the Motion, Rockstone points out that Alisa was employed during the marriage and at the time the Settlement Agreement was executed. The Trustee, in its affirmation in support of the Motion, argues that Alisa's claim is not a DSO; instead, he argues that Alisa's claim should be reclassified from a priority claim to a general unsecured claim to the extent that the debt remains unsatisfied by the sale proceeds generated from the foreclosure sale of the Cape Coral Property. The Trustee also challenges the fees and expenses added to the Claim as there is no documentation supporting these additional amounts.

Alisa argues that the amount still due under the SBA loan is a DSO, resulting in a priority claim. According to Alisa, the characterization of the Debtor's obligation to satisfy the SBA loan as a property settlement is not relevant to the Bankruptcy Court's determination of whether the obligation is in the nature of alimony, maintenance, or support. In their affidavits in opposition to the Motion, Alisa and the Debtor both aver that the Debtor agreed to pay the SBA loan because the parties intended that Alisa be able to continue to reside in the Marital Residence, which had been significantly leveraged during the marriage. Alisa contends that the intent of the parties at the time the Settlement Agreement was drafted, coupled with the fact that Alisa was unable to remain in the Marital Residence absent the Debtor's agreement to hold her harmless from this mortgage obligation, dictate that the Claim is in the nature of alimony, maintenance, or support.

## *Discussion*

### A. Bankruptcy Code Sections Explained

When Congress enacted BAPCPA, one of the many consequences noted by scholars and jurists was that the protections available to family members who rely on debtors for domestic

support were strengthened. *See* Becker McKay Wyckoff, *They're Just Letting Anyone in These Days: The Expansion of S 523(a)(5)'s "Domestic Support Obligation" Exception to Discharge*, 28 EMORY BANKR. DEV. J. 637, 677 (2012). First, Congress added a definition for a "domestic support obligation,"[5] which has been incorporated into several sections of the Bankruptcy Code, including sections 507(a)(1) and 523(a)(5). Congress also amended section 507(a) of the Code to accord first priority of payment to DSOs in recognition of the importance of ensuring that a debtor provides the basic necessities to his or her ex-spouse and children. *See* 11 U.S.C. § 507(a)(1); *see also* H.R. REP. No. 109-31, at 16 (2005). As a result, DSOs have a higher priority of payment than any other priority obligations under the Code.

Under BAPCPA, section 523(a) was modified to further restrict the dischargeability of debts arising from matrimonial actions. *In re Rogowski*, 462 B.R. 435, 439 (Bankr. E.D.N.Y. 2011). While a section 523(a)(5) DSO is separate and distinct from a section 523(a)(15) property settlement, both are non-dischargeable in a chapter 7 case.

---

[5] A domestic support obligation is defined as follows:

> [A] debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is--
> (A) owed to or recoverable by--
> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
> (ii) a governmental unit;
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of--
> (i) a separation agreement, divorce decree, or property settlement agreement;
> (ii) an order of a court of record; or
> (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A).

The most significant change for purposes of this case is that DSOs are now given a separate and higher priority of payment than property settlements. Whether the Claim fits within the definition of a DSO bears significantly on the degree to which the Claim will be satisfied from the Debtor's estate. In analyzing this definition, the following rules of statutory construction must be heeded. First, in ascertaining the meaning of words in a statute, we start with "the common meaning of the words in it." *Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 328 (2d Cir. 2007). Statutory enactments must be read so as to give effect to every clause and word. *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992). Courts correctly assume, "absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 388 (1993).

The relevant language the Court must interpret is set forth in section 101(14A) as follows:

> Under this Code provision, a "domestic support obligation" is established by four elements, as a debt: (1) "owed to or recoverable by ... a former spouse ... of the debtor," § 101(14A)(A); (2) "in the nature of alimony, maintenance, or support ... of such ... former spouse ... without regard to whether such debt is expressly so designated," § 101(14A)(B); (3) "established or subject to establishment before, on, or after the [petition date] by reason of applicable provisions of ... a separation agreement, divorce decree, [ ] property settlement agreement[, or] an order of a court of record," § 101(14A)(C); and (4) "not assigned to a nongovernmental entity," § 101(14A)(D). To meet her burden under § 523(a)(5), the creditor must demonstrate that the debt at issue satisfies these four elements enumerated in § 101(14A).

*McFadden v. Putnam (In re Putnam)*, Adversary No. 10-01261-A, 2012 WL 8134423, at *13 (Bankr. E.D. Cal. Aug. 30, 2012).

The parties do not dispute that the Claim arises from the Settlement Agreement, which was executed prepetition, and pursuant to which the Debtor agreed to pay the SBA loan and to

indemnify Alisa with respect to the SBA loan. However, the parties failed to analyze whether the debt is "owed to or recoverable by" Alisa. Pre-BAPCPA, section 523(a)(5) provided that a debt for a DSO was non-dischargeable if the debt was owed directly to a "spouse, former spouse, or child of the debtor." 11 U.S.C. § 532(a)(5) (1982). Most courts did not follow the specific language of the statute, and focused solely on the nature of the obligation to determine whether it was a DSO. *See, e.g., Beaupied v. Chang (In re Chang)*, 163 F.3d 1138, 1141-42 (9th Cir. 1998); *Stark v. Bishop (In re Bishop)*, No. 97-2151, 1998 U.S. App. LEXIS 12900, at *4-9 (4th Cir. June 18, 1998); *Strickland v. Shannon (In re Strickland)*, 90 F.3d 444, 445-47 (11th Cir. 1996); *Holliday v. Kline (In re Kline)*, 65 F.3d 749, 751 (8th Cir. 1995); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1488-89 (10th Cir. 1995); *Dvorak v. Carlson (In re Dvorak)*, 986 F.2d 940, 941 (5th Cir. 1993); *Gianakis v. Gianakis (In re Gianakis)*, 917 F.2d 759, 763-64 (3d Cir. 1990); *In re Seibert*, 914 F.2d 102, 104-07 (7th Cir. 1990); *Calhoun v. Long (In re Calhoun)*, 715 F.2d 1103, 1107 (6th Cir. 1983). These cases "read out" the requirement in the statute that the payee be one of the enumerated parties, and looked at which party was intended to benefit from the obligation, regardless of the identity of the actual payee.

In contrast, the Second Circuit created an exception to the strict identity of payee requirement. *See Pauley v. Spong (In re Spong)*, 661 F.2d 6, 7 (2d Cir. 1981). In *In re Spong*, the Second Circuit found that a debtor's undertaking to pay his ex-spouse's attorney fees incurred during divorce proceedings created a non-dischargeable DSO by reasoning that the agreement resulted in a third party beneficiary contract. *See id.* In considering the issue, the Second Circuit referred to the statements of the House Judiciary Committee, which explained that the intent of section 523(a)(5) was to render non-dischargeable "any debts resulting from an agreement by the debtor to hold the debtor's spouse harmless on joint debts, to the extent that the

agreement is in payment of alimony, maintenance, or support of the spouse . . . ." H.R. REP. NO. 95-595, at 364 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6320. The Second Circuit concluded that if the debtor failed to pay the third party, he thus failed to satisfy an obligation to his ex-spouse, even though the direct payee was not an individual listed in the statute. *See In re Spong*, 661 F.2d at 7. The debtor's obligation to his spouse runs parallel with the debtor's undertaking to pay the obligation to the third party. Other circuit courts have followed the reasoning of *In re Spong*. *See, e.g., DeKalb Cnty. Div. of Fam. & Children Servs. v. Platter (In re Platter)*, 140 F.3d 676, 681 (7th Cir. 1998); *In re Miller*, 55 F.3d 1487, 1490, n. 3 (10th Cir. 1995).

BAPCPA altered the requirements necessary for finding that an obligation is a DSO. While the new definition specifies that the payee be a spouse, former spouse, or child of the debtor, as in the prior statute, the universe of payees has expanded to include the child's parent, legal guardian, or responsible relative. BAPCPA also now provides that a DSO may be "owed to or *recoverable by*" the payees named in the statute. 11 U.S.C. § 523(a)(5) (2006) (italics added). This new definition has spawned several lines of case law. Some courts infer that by identifying the universe of payees, Congress reinforced the restrictions on who could assert a DSO. *See Tucker v. Oliver*, 423 B.R. 378, 379-81 (W.D. Okla. 2010); *see also In re Aguirre*, Bankr. No. 11-41126-JDP, 2012 WL 632400 (Bankr. D. Idaho Feb. 27, 2012). Other courts read the new language to include obligations to make payments to third parties that are recoverable by a former spouse. *See, e.g., In re Johnson*, 397 B.R. 289, 295 (Bankr. M.D.N.C. 2008) (holding that the Code excepts from discharge debts resulting from agreements by the debtor to hold the debtor's spouse harmless on joint debts to the extent those debts are in the nature of alimony, maintenance, or support). Other courts continue to ignore the payee language altogether, instead

focusing on the nature of the obligation. *See, e.g., Kennedy v. Kennedy (In re Kennedy),* BAP No. AZ-09-1035-JuPaDu, 2010 Bankr. LEXIS 3169, at *24-27 (D.N.J. June 30, 2010); *Coleman v. Blackwell (In re Blackwell)*, 432 B.R. 856, 862-63 (Bankr. M.D. Fla. 2010). Some courts in this circuit adopt the position that the payee language pre-BAPCPA is so similar to the payee language post-BAPCPA that the Second Circuit would apply the current language in the same manner as it did in *In re Spong*. *In re Rogowski*, 462 B.R. 435, 444 (Bankr. E.D.N.Y. 2011); *see Asselin–Connolly, LLC v. Rubenstein (In re Rubenstein)*, Adversary No. 09–2056, 2012 WL 837339, at *3 (Bankr. D. Conn. Mar. 9, 2012). Courts in this circuit following this approach have applied pre-BAPCPA law the same way, and continue to rely on *In re Spong*'s exception to the statute.

While this Court agrees that the Claim fits within subparagraph (A), it is not based on pre-BAPCPA case law, but on the language added by BAPCPA. Therefore, this Court follows *In re Johnson* in concluding that the definition of a DSO is broader than the language previously used to determine whether a DSO exists. *See In re Johnson*, 397 B.R. at 295. An obligation that Alisa has a legal right to recover from the Debtor, such as the SBA loan, falls squarely within this definition. As such, the judicial exception created by *In re Spong* is not necessary in this instance.

Having established that subparagraph (A) applies to the Claim, the Court turns to whether the Claim fits within subparagraph (B). The description of a DSO now includes obligations "in the nature of" alimony, maintenance, or support "without regard " to whether the obligation is designated as such in the agreement. 11 U.S.C. § 101(14A). The Code now directs courts to consider the nature of the obligation "without regard" to how the obligation is designated in the operative agreement. The Oxford Dictionary defines "regard" as follows: to "consider or think

of (someone or something) in a specified way;" "pay attention to; heed." Oxford Dictionary, Oxford University Press (2013). Thus, "without regard," as used in the Code, means without paying attention to or without considering.

The choice of language in the statute is an acknowledgement of the reality that parties often label obligations in divorce settlement agreements in certain ways for tax purposes, based on corporate considerations, or for myriad other reasons. *See Benson v. Benson (In re Benson)*, No. 11-12284, 2011 WL 4435560, at *1 (11th Cir. Sept. 26, 2011) (describing how the parties intended mortgage payments to be a DSO despite the fact that the ex-wife had waived any right to claim alimony by reasoning that the ex-wife did so in consideration of benefits she received in the settlement agreement). These agreements, including the definitions of the terms within them, are fully enforceable under state law and in the context of determining tax treatment of payments. However, when a debtor files for bankruptcy relief, certain provisions in the Bankruptcy Code can alter what would otherwise occur under state law. The Code may be used to modify the relationships between a debtor and his or her creditors, and in some cases, to modify contracts. *See In re W.R. Grace & Co.*, 475 B.R. 34, 157 (D. Del. 2012) ("Courts have routinely recognized various sections of the Bankruptcy Code as countervailing federal interests that can lawfully alter state law contract rights.").

Pre-BAPCPA case law has echoed this sentiment in domestic relations matters. *See Brody v. Brody (In re Brody)*, 3 F.3d 35, 38 (2d Cir. 1993). Post-BAPCPA, Congress has rendered the labels attached to an obligation in a divorce agreement even less relevant. Therefore, as was the case pre-BAPCPA, courts must continue to look to the substance, and not merely the form, of the payments. *Id.; see In re Yeates*, 807 F.2d 874, 878 (10th Cir. 1986); *see also Tilley v. Jessee*, 789 F.2d 1074, 1077-78 (4th Cir. 1986). However, this determination is

limited to finding whether the Claim is a priority claim and has no bearing on the validity of the Settlement Agreement or its terms outside the bankruptcy context.

**B. Test for Determining Whether an Obligation is in the Nature of Alimony, Maintenance, or Support**

In this circuit, as in other circuits, the intent of the parties at the time the separation agreement was executed has been determinative of whether the obligation is in the nature of alimony, maintenance, or support. *In re Brody*, 3 F.3d at 38 ("Under bankruptcy law, the intent of the parties at the time a separation agreement is executed determines whether a payment pursuant to the agreement is alimony, support or maintenance within the meaning of section 523(a)(5)."). *See generally In re Davidson*, 947 F.2d 1294, 1296-97 (5th Cir. 1991); *Gianakas v. Gianakas (In re Gianakas)*, 917 F.2d 759, 762 (3d Cir. 1990). Courts have considered a great variety of factors in seeking to ascertain the mutual intent of the parties. *See, e.g., Vittorini v. Vittorini*, 136 B.R. 632, 635 (Bankr. S.D.N.Y. 1992) (listing five factors); *In re Bell*, 47 B.R. 284, 287 (Bankr. E.D.N.Y. 1985) (listing nine factors). Courts have also found, however, that lists of factors are not necessarily exclusive. Instead, some courts have determined that all direct or circumstantial evidence that tends to illuminate the parties' subjective intent is relevant. *In re Brody*, 3 F.3d at 38; *see Benich v. Benich (In re Benich)*, 811 F.2d 943, 945-46 (5th Cir. 1987); *see also Williams v. Williams (In re Williams)*, 703 F.2d 1055, 1057-58 (8th Cir. 1983).

Post-BAPCPA, *In re Brody* remains good law and in general, the intent of the parties should bear on whether an obligation is in the nature of a DSO. In this case, the labels affixed to the Debtor's obligation in the Settlement Agreement stand in stark contrast to the parties' subsequent affidavits describing their shared intent that the Settlement Agreement was to ensure shelter was provided for Alisa. The Court must go beyond the stated intent of the parties in this case to reach a determination.

To be a DSO post-BAPCPA, the appropriate inquiry is to determine whether the obligation is "in the nature of" alimony, maintenance, or support rather than whether the obligation *is* alimony, maintenance, or support as the Code called for when *In re Brody* was decided. This Court uses an objective test to determine whether an obligation is in the nature of alimony, maintenance, or support. An obligation is in the nature of alimony, maintenance, or support where all prongs are met: 1) One spouse agrees in a divorce settlement agreement to make payments, which directly or indirectly cause shelter to be provided for the other spouse; 2) The resident spouse would not be able to afford to remain in the marital residence but for the other spouse's payments; and 3) There is a discrepancy in income between the spouses. While the labels affixed to the obligations in state law settlement agreements are irrelevant, determining the nature of the obligation requires an understanding of the terms of the settlement and the effect these terms have on the living situations of the parties.

**C. Terms of the Settlement Agreement**

The Settlement Agreement was drafted to ensure that Alisa had shelter after the divorce. Upon the Debtor and Alisa's divorce, the Debtor became solely responsible for the CitiMortgage Loan and the SBA loan. The Settlement Agreement provided that the Debtor was to obtain a release from the SBA of its mortgage on the Marital Residence.[6] Alisa was to remain in this property as its sole occupant.

The facts support a finding that unless the Debtor assumed the SBA loan, Alisa would not have had the financial wherewithal to remain in the Marital Residence. At the time of the divorce, Alisa's income was inadequate for her to meet her expenses and make payments on the four mortgages on the Marital Residence. The Debtor's obligation is to ensure that Alisa is

[6] The Debtor was also to remove the CitiMortgage lien from the Marital Residence, but he has since satisfied this obligation.

provided with shelter. The obligation that enables one's family to maintain shelter is in the nature of support. *In re Trump*, 309 B.R. 585 (Bankr. D. Kan. 2004) (finding that an obligation to make payments on a second mortgage and ultimately to satisfy the note was in the nature of support). *See also Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 723 (10th Cir. 1993). Because the Claim satisfies all of the conditions of a DSO, it is a DSO priority claim pursuant to section 507(a)(1)(A). The Claim is also non-dischargeable (and would be whether it was found to be a property settlement or a DSO).

***Conclusion***

Based on the foregoing, the Court finds that the Claim is a DSO. This Memorandum Decision does not make any findings as to the amount of Alisa's claim. This Court's finding that the Debtor's obligation to Alisa is in the nature of alimony, maintenance, or support, and thus a DSO for purposes of section 507(a) of the Bankruptcy Code, will be dispositive on any subsequent questions of dischargeability.

Dated: Central Islip, New York
July 22, 2013

*/s/ Robert E. Grossman*
Hon. Robert E. Grossman, U.S.B.J.